<u>**NOT FOR PUBLICATION**</u>                                                                              **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LOUIS COPELAND, JR., | ) |
| Plaintiff, | ) Civil Action No.: 07-341 (JLL) |
| v. | ) |
|  | ) **OPINION** |
| UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, et al., | ) |
| Defendants. | ) |

**LINARES**, District Judge.

This matter comes before the Court on the motion for summary judgment filed by Defendants University of Medicine and Dentistry of New Jersey ("UMDNJ") and Dr. Bruce Vladeck (collectively "Defendants"). Plaintiff Louis Copeland commenced this action alleging that he was terminated from his employment with UMDNJ because of whistle-blowing activity. He asserts claims for a violation of New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. §§ 34:19-1 to 34:19-8, a violation of his constitutional rights pursuant to 42 U.S.C. § 1983, and for wrongful discharge in violation of public policy. Defendants' motion is opposed only by an untimely filed counter-statement of facts;[1] no opposition brief was filed. The

---

[1]Plaintiff's opposition papers were due on February 17, 2008; the motion return date was March 2, 2008. On March 3, 2009, Plaintiff filed a "Supplemental Statement of Disputed Material Facts and Response to Defendant[s'] Rule 56.1 Statement of Facts." This document was labeled "Brief" on the docket, but no brief was attached. Plaintiff's counsel also submitted a certification which lists attached exhibits in support of the opposition, but no exhibits were included.

Court has considered the parties' submissions, including Plaintiff's counter-statement of facts, and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, Defendants' motion for summary judgment is granted.

**I.      BACKGROUND**

On May 4, 2006 Mr. Copeland was terminated from UMDNJ.  (Stmt. of Undisputed Mat'l Facts Pursuant to Local R. 56.1 in Supp. of Defs. University of Medicine & Dentistry of New Jersey & Dr. Bruce Vladeck's Mot. for Summ. J. ¶ 7 [hereinafter "Defs.' Fact Stmt."].)  At the time of his termination, Mr. Copeland was Manager of Local Government Relations in UMDNJ's Government Affairs Department.  (Id.)  Julane Miller-Armbrister, Vice-President of the Government Affairs Department at the time of Mr. Copeland's termination, recommended to UMDNJ's Interim President, Dr. Vladeck, that he be terminated along with other employees.  (Id. at ¶¶ 4, 8, 42, 44.)  Dr. Vladeck approved Mr. Copeland's termination.  (Id. at ¶ 52.)  Defendants assert that Mr. Copeland was terminated as part of a workforce reduction due to budgetary concerns.  (See id. at ¶¶ 36-38, 55.)  Mr. Copeland asserts that he was terminated because of his whistle-blowing to the Federal Bureau of Investigation ("FBI").  (Compl. ¶ 24.)

Between August 2004 and her resignation in December 2005, Christie Davis-Jackson was Vice-President of the Government Affairs Department.  (Defs.' Fact Stmt. ¶ 4.)  During this time, Mr. Copeland alleges that he "objected to and reported [to the FBI] certain alleged unlawful activities within the Government Affairs Department."  (Id. at ¶ 9.)  Most of the activities that he reported involved Ms. Davis-Jackson.  (Id.)  Specifically, he alleges that he was asked to make an improper contribution to New Jersey Congressman Frank Pallone in October 2004 and that the department made improper expenditures related to an event called Keeping the Dream Alive in

February 2005.  (Id. at ¶¶ 10-11, 16-21.)

In a discussion related to the Pallone contribution and his questions regarding the contribution, Mr. Copeland asserts that Ms. Davis-Jackson "reminded him that she would be reviewing his job in the near future." (Pl.'s Supplemental Stmt. of Disputed Mat'l Facts & Response to Defs.' R. 56.1 Stmt. of Facts ¶ 19 [hereinafter "Pl.'s Counter-Stmt. of Facts"].)  He asserts that in response to various objections he made over time she "question[ed] his loyalty, and [told] him he needed to make up his mind whether he wanted to be a team player or not," and told him that "it would be best if he kept his mouth shut." (Id. at ¶¶ 23, 37.)  In addition in May 2005, Mr. Copeland asserts that his supervisor Gloria Soto "asked him why he was still there and why he didn't leave if he didn't like being in the middle of these problems going on." (Id. at ¶ 36.)  He also testified that in June or July 2005, in a telephone conversation with an "assistant" to an attorney representing UMDNJ in connection with the federal investigations, he said to the assistant "they probably want me gone," and the assistant told him "yeah." (Defs.' Fact Stmt. ¶ 86.)  Mr. Copeland admits there were no further conversations on the matter.  (Id.)  Finally, Mr. Copeland asserts that UMDNJ employee April Coage, who assisted him with the Keeping the Dream event, "warned" him that Newark City Council President Donald Bradley and Mary Mathis-Ford, a member of a community advisory board to UMDNJ, had mentioned firing him. (Id. at ¶ 88.)

Mr. Copeland first contacted the FBI in February 2005 after the Keeping the Dream Alive event.  (Id. at ¶¶ 22, 25.)  He continued to cooperate with the FBI until February 2006.  (Id. at ¶ 25.)  As a result of the FBI investigation, on December 30, 2005 "UMDNJ entered into a Deferred Prosecution Agreement with the United States Attorney's Office for the District of New Jersey."

(Id. at ¶ 32; Cert. of Paula M. Castaldo, Esq., Ex. F [hereinafter "Castaldo Cert."].)  The Deferred Prosecution Agreement required UMDNJ "to retain a Federal Monitor selected by the United States Attorney's Office whose role was to . . . oversee UMDNJ's financial operations and monitor UMDNJ's compliance with the Deferred Prosecution Agreement."  (Defs.' Fact Stmt. ¶ 32.)

In January 2006 a journalist for the Star-Ledger contacted Mr. Copeland requesting comment on an upcoming article.  (Id. at ¶ 33.)  In accord with the instructions under the Deferred Prosecution Agreement, he forwarded the email request to Ms. Miller-Armbrister.  (Id.)  She forwarded the email to the federal monitor.  (Id.)  The Star-Ledger article was published on February 19, 2006.  (Id. at ¶ 31.)  The article stated:

> According to multiple sources with direct knowledge of the ongoing federal investigation, Louis Copeland-manager of government relations in the government affairs department-told the grand jury he was instructed to contribute $1,000 to Rep. Frank Pallone . . . .
> Copeland testified that after he made the contribution, he was repaid in cash, those sources said.
> * * *
> [Mr.] Copeland declined comment for this report.

(Castaldo Cert., Ex. J., see also Defs.' Fact Stmt. ¶ 31.)    Although Mr. Copeland provided information to the FBI, he never testified before the federal grand jury in connection with the FBI investigation of UMDNJ.  (Defs.' Fact Stmt. ¶ 26.)  Carol Caprarola was also mentioned in the article as "rais[ing] warning flags."  (Castaldo Cert., Ex. J.)  Ms. Caprarola was also among the employees terminated at the same time as Mr. Copeland.  (Defs.' Fact Stmt. ¶ 51.)

Mr. Copeland asserts that Ms. Davis-Jackson, Ms. Soto, and Councilman Bradley, among others, consulted with or influenced Ms. Miller-Armbrister's decision to terminate him.  (Id. at ¶

67.) He has submitted no evidence to this effect beyond his own speculation. (See, e.g., id. at ¶¶ 81-90.) Ms. Miller-Armbrister certified that she did not consult Ms. Davis-Jackson about the decision to terminate Mr. Copeland and that no other person influenced or attempted to influence her decision; the decision to terminate Mr. Copeland was hers alone, subject to the approval of Dr. Vladeck. (Id. at ¶¶ 44, 91.)

Ms. Miller-Armbrister admits that at the time of Mr. Copeland's termination she was aware that he had spoken to the FBI and federal monitor; Mr. Copeland had told her he had done so. (Id. at ¶ 59.) She testified that she believed that everyone in the Government Affairs Department had spoken to the FBI and the federal monitor; she also had been interviewed by the FBI, spoken to the monitor, and testified in front of the grand jury. (Id. at ¶¶ 60-62.) In addition to a general allegation that Ms. Miller-Armbrister terminated him for his whistle-blowing activities, of which she was aware, Mr. Copeland also "testified that he believes Ms. Miller-Armbrister bore retaliatory animus against him because he purportedly had damaging information about her that he could report to the FBI." (Id. at ¶ 69.) The allegedly damaging information is an allegation that she withheld memorandum related to UMDNJ contributions. (Id.) He alleges that the memorandum were removed or stolen from Ms. Davis-Jackson's office and subsequently found in the Trenton office, the office where Ms. Miller-Armbrister worked at the time. (Id. at ¶¶ 69-72.) However, in his deposition, Mr. Copeland "admitted that he does not know, for a fact, whether the. . . memoranda at issue were stolen or removed from Ms. Davis-Jackson's Newark office or even whether they ever were kept in that office," or "whether Ms. Miller-Armbrister knew that copies of any memoranda . . . were located in the Trenton office." (Id. at ¶ 73.) The existence of the memorandum were not unknown at the time of Mr. Copeland's termination; they were

referred to in the February 19 Star-Ledger article.  (See Castaldo Cert., Ex. J.)

At the time of Mr. Copeland's termination, Dr. Vladeck certifies that "he never had met or spoken to [Mr. Copeland] and was not aware of [his] whistle-blowing activities."  (Id. at ¶ 64.)  Mr. Copeland does not present any evidence that Dr. Vladeck was aware of his FBI cooperation.  Rather, he asserts that it is inconceivable that the "new President of UMDNJ did not read the February 19, 2006 Star-Ledger article identifying [Mr. Copeland]."  (Pl.'s Response to Defs.' R. 56.1 Stmt. of Facts ¶ 64 [hereinafter "Pl.'s Fact Response"].)  Dr. Vladeck became Interim President of UMDNJ in March 2006.  (Defs.' Fact Stmt. ¶ 8.)  Mr. Copeland also asserts that Dr. Vladeck knew that he had cooperated with the FBI "because [he] allegedly read a non-redacted version of a particular Federal Monitor report that purportedly identified [Mr. Copeland] as a whistle-blower."  (Id. at ¶ 78.)  Mr. Copeland admits that he "never saw non-redacted versions of any of the Federal Monitor's reports and does not know for a fact that he was identified by name therein."  (Id. at ¶ 79.)  Dr. Vladeck certified that he did not see a non-redacted version of the Federal Monitor reports.  (Id. at ¶ 80.)  But, Mr. Copeland asserts that whether mentioned by name or not, his identity was clear from the various facts detailed in the report.  (Pl.'s Counter-Stmt. of Facts ¶¶ 82-85.)

## II.    LEGAL STANDARDS

A court shall grant summary judgment under Rule 59© of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  On a summary judgment motion, the moving party first must show that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  Id. at 324.   The non-moving party must offer specific facts that establish a genuine issue of material fact; the non-moving party may not simply rely on unsupported assertions, bare allegations, or speculation.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).  Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

### III.    DISCUSSION

#### A.    New Jersey CEPA Claim

"To establish a prima facie cause of action under CEPA, a plaintiff must demonstrate that[:] '(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3c[;] (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.'"  Yurick v. State, 875 A.2d 898, 903 (N.J. 2005) (quoting Dzwonar v. McDevitt, 828 A.2d 893, 900 (2003)).  Here, Defendants assert that Mr. Copeland has failed to establish a causal connection exists between his cooperation with the FBI and his termination.

Mr. Copeland has asserted facts which could support an allegation of animus by Ms. Davis-Jackson and perhaps other UMDNJ employees or affiliated persons.  "But [a] retaliatory *motive* on the part of non-decision-makers is not enough to satisfy the *causation* element of a

CEPA claim." Caver v. City of Trenton, 420 F.3d 243, 258 (3d Cir. 2005) (emphasis in original). Here, at the time of his termination, Ms. Davis-Jackson was not even a UMDNJ employee, and no evidence exists that anyone besides Ms. Miller-Armbrister and Dr. Vladeck were involved in the decision to terminate him. Thus, to survive summary judgment he must demonstrate that a genuine issue of material fact exists regarding whether *Ms. Miller-Armbrister* and *Dr. Vladeck* were motivated by retaliation in their decision to terminate his employment. This Court finds that he has not done so. Even assuming that Dr. Vladeck was aware of Mr. Copeland's FBI cooperation, such knowledge alone is not enough, especially under the circumstances of this case.

The entire department was under FBI investigation; all employees were required to cooperate with the FBI and the federal monitor. Additionally, Ms. Miller-Armbrister and Dr. Vladeck were put into their positions after the FBI investigation began and after the Deferred Prosecution Agreement was entered into; the department was being monitored at the time of Mr. Copeland's termination. No evidence has been submitted that Ms. Miller-Armbrister or Dr. Vladeck were not cooperating with the monitor or that they had made any statements to Mr. Copeland expressing disapproval of his cooperation. In fact, when Mr. Copeland forwarded the Star-Ledger journalist's email request for comment to Ms. Miller-Armbrister, she forwarded it to the monitor in accordance with the Deferred Prosecution Agreement. Mr. Copeland points out that Ms. Miller-Armbrister testified that "'it would be true' that anyone that assisted in making charges of corruption at UMDNJ public had contributed to UMDNJ's loss of political capital." (Pl.'s Counter-Stmt. of Facts ¶ 74.) However, what Ms. Miller-Armbrister stated in full was that

> [i]n general, I guess, [it] would have to be a true statement. But, at the time with everything the University was going through, I don't know how much any one person contributed to [the loss of political capital] or not or whether or not it was a

component of everything that was happening at the University at the time. (Castaldo Cert., Ex. B., Ms. Miller-Armbrister Dep., Tr. 170:15-20.)  The Government Affairs Department was a lobbying group, political capital is important, and testimony indicates that the investigation damaged UMDNJ's political capital.  Acknowledging that fact, however, does not provide a link between Mr. Copeland's FBI cooperation and his termination by Ms. Miller-Armbrister.  Finally, with respect to his allegations that Ms. Miller-Armbrister withheld damaging memorandum, this Court finds those allegations baseless.  Mr. Copeland has presented no evidence that Ms. Miller-Armbrister even knew about the memorandum. Therefore, this Court finds that with respect to his CEPA claim against UMDNJ no genuine issue of fact exists regarding whether the decision to terminate him was motivated by retaliatory animus; summary judgment in favor of UMDNJ on this claim is appropriate.

For the same reasons as discussed above, summary judgment in favor of Dr. Vladeck in his official and individual capacity is also appropriate.   The official capacity claim is duplicative of his claim against UMDNJ.  With respect to the claim against him in his individual capacity, individual liability may be imposed under CEPA.  See Fasano v. FRB, 457 F.3d 274, 289 (3d Cir. 2006).  But, a plaintiff must still establish all of the elements of a CEPA claim against the individual defendant.  There is no evidence that Dr. Vladeck, who assumed his position in March 2006, was aware of Mr. Copeland's cooperation.  See Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protective conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.") But, as discussed above, even if Dr. Vladeck was aware of Mr. Copeland's conduct, no evidence provides any basis for the allegation that Dr. Vladeck's approval of his termination was *motived*

by retaliatory animus.

      **B.**     **Section 1983 Claim**

To establish a § 1983 claim against a defendant in his individual capacity, a plaintiff must establish that he was deprived of a right by a defendant who was acting under color of state law. 42 U.S.C. § 1983. Dr. Vladeck admits that he was acting under color of state law. Thus, the only issue is whether a genuine issue of fact exists as to whether Dr, Vladeck violated Mr. Copeland's rights. Mr. Copeland asserts that his termination violated his First Amendment rights. The Third Circuit applies a three part test for allegations of retaliation for exercising First Amendment rights: (1) "a plaintiff must show that his conduct was constitutionally protected;" (2) "he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action;" and then (3) "the defendant may defeat the plaintiff's case 'by showing that it would have taken the same action even in the absence of the protected conduct.'" Ambrose, 303 F.3d at 493. For the same reasons as discussed above with regard to the CEPA claim, this Court finds that there is no genuine issue of material fact that Mr. Copeland's FBI cooperation was a substantial motivating factor in the termination decision.

With respect to a claim against Dr. Vladeck in his official capacity, that claim is duplicative of the claim against UMDNJ. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). However, because there is no respondeat superior under § 1983, for this claim to survive summary judgment, a genuine issue of material fact must exist as to whether his termination was executed

as part of a UMDNJ "policy" or "custom."  Bd. of the County Comm'rs of Bryan County, Oklahoma, 520 U.S. 397, 403 (1997) (citing Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 694 (1978)); see also Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 2000).  "There are three situations where the acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983."  See Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).  These include: (1) "where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy;" (2) "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;" and (3) "where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Id. (internal quotations and citations omitted).

In his Complaint, Mr. Copeland asserts that UMDNJ has a policy or custom of retaliating against whistle-blowers.  (Compl. ¶ 31.)  The policy making body of UMDNJ is the Board of Trustees ("Board"), not its President.  As an initial matter, as this Court has previously found, Mr. Copeland has failed to create a genuine of fact that a UMDNJ employee retaliated against him. Beyond that, there is no evidence that the Board promulgated or articulated a formal policy of retaliating against whistle blowers in general, nor is there any evidence supporting the conclusion that there is a widespread custom of such retaliation.  Mr. Copeland points to the fact that other employees who cooperated, particularly Ms. Caprarola, who was also mentioned by name in the

Star-Ledger's February 19 article, were also terminated. However, since everyone in the Government Affairs Department was "cooperating" with the FBI, it is not surprising that other employees who were terminated also were providing information to the FBI. Mr. Copeland does not present evidence that anyone was terminated for objecting to the department's activities prior to the public investigation or at any other time. Therefore, since Mr. Copeland has not established that a genuine issue of material fact exists as to whether he was retaliated against much less that UMDNJ had a policy or custom of retaliation, summary judgment on this claim in favor of UMDNJ is also appropriate.

    C.    **Wrongful Discharge Claim**

Under New Jersey law, an employee may have "a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Pierce v. Ortho Pharm. Corp., 417 A.2d 505, 512 (N.J. 1980). However, UMDNJ is a public entity, see N.J.S.A. 18A:64G-3, and, therefore, under the New Jersey Tort Claims Act ("NJTCA"), notice is required before bringing an action against it, Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 174 (3d Cir. 2006) (citing N.J.S.A. 59:8-3 and 8-8 and Moon v. Warren Haven Nursing Home, 867 A.2d 1174, 1176 (N.J. 2005)). Mr. Copeland admits that he has not complied with the notice requirements of the NJTCA. (Defs.'s Fact Stmt. ¶ 115; Pl.'s Fact Response ¶ 115.) Therefore, Mr. Copeland's claims against UMDNJ and Dr. Vladeck in his official capacity must be dismissed.

With regard to his claims against Dr. Vladeck in his individual capacity, Defendants assert that Mr. Copeland has waived these claims under CEPA pursuant to N.J.S.A. 34:19-8. This Court agrees. Under CEPA, "[o]nce a CEPA claim is 'instituted,' any rights or claims for retaliatory

discharge based on . . . State law . . . are all waived." Baldassare v. State of New Jersey, 250 F.3d 188, 202 (3d Cir. 2001) (quoting Young v. Schering Corp., 660 A.2d 1153, 1160 (N.J. 1995)). Here, Mr. Copeland also admits that the same conduct supports both his CEPA and his wrongful discharge claim; they are parallel claims. See id. Therefore, his wrongful discharge claim against Dr. Vladeck in his individual capacity also must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, this Court grants Defendants' motion for summary judgment. An appropriate Order accompanies this Opinion.

DATED: July 24, 2009

/s/ Jose L. Linares
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE